**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

CASE NO: 10-cv-23869-Altonaga/Simonton

BARNEXT OFFSHORE, LTD.,

     Plaintiff,

v.

PERSHING, SpA, CRN SpA, FERRETTI GROUP
USA, INC. n/k/a ALLIED MARINE, INC.,
CONDARIA 87 Srl, and DOMETIC CORPORATION

     Defendants.

_____/

**DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFF'S**
**OMNIBUS MOTION *IN LIMINE***

COME NOW the defendants, PERSHING, SpA, CRN, SpA, FERRETTI GROUP USA,

INC. n/k/a ALLIED MARINE, INC., CONDARIA 87 SrL, and DOMETIC CORPORATION,

and for their response to the plaintiff's Omnibus Motion *In Limine* (ECF # 279), state as follows:

**A.**    **OMNIBUS MOTION *IN LIMINE***

    **1.**    **Insurance coverage** – The existence of insurance coverage on the M/Y Barnext

is relevant, probative, and not prejudicial.  Barnext makes this coverage an issue in the joint

pretrial stipulation by contending that the yacht is no longer insurable as a result of the fire. (DE

278-2).  One of the defendants' affirmative defenses is that Barnext failed to mitigate its

damages.  Had it simply made a claim with its own insurance, the vessel would have been

repaired quickly and efficiently.  The $350,000 repair estimate from Cable Marine would have

been paid, and Barnext would have avoided the $1.7 million in loss of use damages it now

claims, as well as any other consequential damages.  The carrier could have been brought a

subrogation action against any third party responsible, as is typical for property claims.  *See, e.g.,*
*Florida Drum Co. v. Thompson,* 668 So.2d 192 (Fla. 1996), Rule 411 FRE (evidence of liability
insurance not excluded when offered for purpose other than to prove negligence).

It would be virtually impossible to try this case without reference to Barnext's insurance
coverage.  One of the first parties aboard the vessel after the fire was a surveyor retained by
Barnext's carrier, Joel Sparrow.  Sparrow took constructive possession of the vessel, ordered it
sealed up a few days later, orchestrated inspections by the parties, and secured items removed
from the yacht. (*See, Ex. 1* Joel Sparrow deposition, at pp. 5, 11).  The carrier retained Walter
Godfrey as a fire cause and origin expert, who concluded that the cause was undetermined.  *Id.* at
20.  It also retained Servpro Fire Restoration to clean the interior of the yacht, and Ward's
Marine Electric to do preliminary work on the electrical system, all of this before the defendants
were allowed to conduct any inspections. Barnext's insurance carrier requested that Cable
Marine prepare a repair estimate.  *Id.* at 12.  It took Cable almost 3 months to complete this
estimate, and this delay forms the basis for a portion of Barnext's claim for its loss of use of the
yacht.  Barnext actually kept an insurance claim pending until March 16, 2011, when it entered
into the repair agreement.  *Id.* at 46.  After that, Sparrow returned some $232,000 to the
insurance company that it had advanced for cleanup and as a deposit for repairs. *Id.* at 50.

Another key issue in the case directly relates to the valuation of the yacht.  Prior to the
fire, Howard Barnett ran it aground at high speed, causing severe hull and drive system damage.
Barnext's insurance carrier paid nearly a quarter of a million dollars for the damages, which
explains Barnext's reluctance to make another claim.  After the fire, per Sparrow's assessment,
there was no reason that the yacht could not be completely repaired, without any loss in value

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

from the stigma of the fire. *Id.* p. 40. As of October 25, 2010, prior to Barnext filing this lawsuit, Cable Marine's fire mitigation efforts eliminated of all smoke damage. *Id.* at 55-56. At the time of the fire, the yacht was insured for a value of $3.2 million, which is indicium of its actual value. Sparrow was the insurance surveyor for both the grounding and the fire, putting him in the unique position to address the condition of the yacht before and after the fire.

Without the testimony of insurance surveyor Joel Sparrow, the defendants will be unfairly prejudiced in presenting their case, and will lose the opportunity to present critical evidence that is relevant, probative of materials factual issues, and not unduly prejudicial.

     **2.**     **Wealth of the parties** – The defendants have no evidence of the plaintiff's net worth. The defendants note, however, that Howard Barnett is not a party to this lawsuit. No cases have been found which restrict a party's ability to comment on the wealth of a nonparty. As a result, there is no prohibition against such comments, although the defendants are unaware of Mr. Barnett's net worth. Even if there were, it will be very difficult for a jury to learn that Barnext Offshore purchased a $4 million yacht, and spent hundreds of thousands of dollars decorating and outfitting it, without inferring that it has significant economic resources. The defendants will not comment on either Barnext Offshore or Mr. Barnett's net worth, but do not agree that comments concerning either's economic resources should be excluded. For example, even without consideration of insurance, Barnext could easily have repaired the vessel, thus mitigating any loss of use damages.

     **3.**     **Offers to compromise** – The defendants agree that offers to compromise this claim are not proper subjects at trial. There are related issues, however, to which this general rule should not apply. For example, in the early stages of this claim, Barnext made demands for

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

636129.1

a return of its purchase price, plus other damages.  Both this demand and the failure to request the repair of the yacht are essential elements for breach of warranty and revocation of acceptance, and for the defense of these claims.  The demand was made to defendant FGUSA only, as the first demand to Pershing, Condaria, and Dometic was service of this lawsuit upon them.  In addition, this case was mediated in June 2010, and a contingent settlement was reached, subject to certain conditions.  Immediately following the mediation and news of settlement, the defendants canceled the shipment of repair parts from Italy.   The settlement conditions unexpectedly failed to materialize, which required the shipment process from Italy to begin again.  This further delayed repairs by almost a month.  As explained below, Barnext spent months negotiating the terms of the repair agreement.  These delays are part of Barnext's loss of use claim.  As stated in the plain language of Rule 408, "Examples of permissible purposes of [evidence of offers to compromise] include . . . negating a contention of undue delay . . ." Because these events were intertwined with the plaintiff's loss of use claim, they must be allowed.

      **4.**    **Repair Agreement** – Barnext's desire to exclude the repair agreement is understandable; however, its argument is not.  Pursuant to the repair agreement, the defendants completely repaired all fire damage to the yacht.  The agreement expressly provides in paragraph 12 that it may be used in this litigation.  It would not make sense otherwise.  It is irrelevant that Barnext is not seeking recovery of repair costs; Barnext contended it was impossible to fully repair the vessel it had used for two years.  It demanded return of its purchase price, expert costs, and its attorney's fees.  Barnext itself introduced at least two months of delay into the repair project due to its lack of hull insurance, and more time with its desire to negotiate unreasonable

terms into the agreement.  This is part of its loss of use claim.  Barnext also sued the Italian defendants after this repair agreement was already in place, without ever having made a demand on them.

Barnext is now enjoying full use of the vessel it previously clamed was destroyed and unrepairable.  Its damage expert rendered opinions regarding the value of the vessel both with and without repairs.  Any decrease in the value of the vessel cannot be determined without reference to its repairs.  As argued in its prior motions, the defendants maintain that the only damages available to Barnext are the cost of repairs.  The defendants seek to introduce the agreement as evidence that there are no additional damages available, with the caveat that it should be admitted with an instruction that it is not evidence that any defendant is liable for these damages.  The agreement is subject to the same exception to Rule 408 as noted above.  The agreement is also in the nature of a release, and indeed contains release language as to the repairs performed in paragraph 10, for which there is no evidentiary prohibition.

5.      **Spoliation of evidence** – The defendants are able to clearly demonstrate that key evidence necessary to their defense is missing.  The defendants generally have no ability to identify all items which were missing from the scene.  Their experts have categorically stated that the available evidence showed there was insufficient fuel to account for the extensive fire damage.  (*See, Ex. 2,* Richard Henderson deposition at pp. 76-78;  *Ex. 3,* James Cote deposition at p.123).  The evidence which is known to be missing, and which is necessary to determine the origin and cause of the fire includes:

1.      any maintenance records for the yacht, including from immediately before the fire;
2.      an electric buffing machine and its flammable pads;
3.      a mesh tool bag;

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

636129.1

    4.      a spool of fishing line;
    5.      an electrical crimping tool;
    6.      an electrical receptacle; and
    7.      other miscellaneous tools.

Additional evidence had reportedly been preserved, but was not made available to the defendants during the experts' joint inspection.  This includes:

    1.      the residue-laden top of the workbench;
    2.      a portable drop light;
    3.      an organizer box, and
    4.      the toolbox from atop the workbench.

The presence of the electric drill is particularly noteworthy, since it was also the subject of a U.S. Consumer Product Safety Commission recall, as it was found to cause accidental fires. (*See Ex. 4*, C.P.S.C. Recall Notice).

Also troubling is the absence of the electric buffing tool, also depicted in Altarac's photos, which was kept in a tool bag with highly flammable buffing pads.  Neither the tool, nor the bag, nor the pads have been seen since the fire department left the scene.  (*See Ex. 5.*, Thomas Long deposition, at pp. 46, 60, 79).  A large electrical crimping tool, too large for casual or personal use, is missing, after leaving a perfect silhouette in the soot of the pump room floor. While this tool would not have caused the fire, it is strong circumstantial evidence that major electrical work had occurred recently in the pump room, for which Barnext provided no records. Barnext never disclosed that the yacht was having work done, and had been out of the water for weeks at Apex Marine just hours before it caught fire. Numerous other electrical and mechanical tools were also missing.  The fact that these items existed at the time of the fire is established by Howard Barnett himself.  He lists them as part of the "other property" lost in the fire.  (*See Ex. 6*, Barnext's "quick list").

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

636129.1

The plaintiff failed to produce *any* maintenance records of the vessel, including those prepared shortly before the fire, despite being kept by Barnext's captain, Mark Alexander. (*See Ex. 7*, plaintiffs' response to request to produce).  The yacht was hauled out of the water for about three weeks while it had paint, air conditioning, and undisclosed other work performed. *See Ex. 8*, Apex Marine invoice of September 2).  No witness provided details as to the amount of work performed, or by whom it was performed.[1]  Paint work was done, presumably with solvents found on the scene.  Work was also performed on the a/c seawater pump below the deck of the pump room and in the control box, in order to hook up an auxiliary a/c system while other work was performed.  Flammable phosphoric acid would have likely been used when Jack Clack flushed the a/c seawater lines in the pump room.  Post-fire photographs showed deck plates removed, allowing access to the seawater lines and strainer below the deck of the pump room. According to James Cote, in his 30 years as in marine electrical systems, he has often found containers filled with solvents left behind by the painters, including within control boxes. (*See Ex. 3*, at p.123).  All of these facts are circumstantial evidence that work was performed for weeks, days, and even hours before in the pump room which could have led to the fire.

Although Barnext's spreadsheet of expenses is detailed enough to capture Alexander's meals at McDonalds, Barnext failed to produce any records of multiple instances of work done on the air conditioning system, or of any other work.  This includes work that was completed only hours before the fire.  The defendants did not obtain the records of Apex Marine until after the close of discovery.  Apex referenced other contractors which did work during this haul-out, none of which were identified by Barnext.  Barnext took the yacht to Apex twice shortly before

---

[1] The plaintiff's expert Tom Long did not see any of these records, "because the testimony that [he] read suggested that they were just fishing (sic) paint scratches."  Long depo. at 138-139.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

636129.1

the fire, once on 6/23/10 and again on 7/20/10.  Its spreadsheet shows that Apex was paid on

8/14/10, which was the **day** of the fire.  Goods and services totaling tens of thousands of dollars

were provided by Boat Owner's Warehouse (7/5, 7/27), Florida Detroit Diesel (8/18), Jack Clark

(8/9), Jose Rodriguez (8/11), MarineMax (7/29), Seafarer Marine (7/20), Painted to Perfection

(8/3), Ward's Marine Electric (8/10), and Two a Day Marine Services (7/16, 7/30, 8/13)(in

addition to $2,000 paid to Mark Alexander on 7/19).  Not included here are entries from soon

after the fire, which may represent additional work done prior to the fire.

The lack of any records helps explain why this fire occurred as a result of the work that

was done, and demonstrates the plaintiff's lack of candor and good faith about this work.  It is

highly relevant and probative, and sufficient to justify a negative inference against the plaintiff.

"An 'adverse inference instruction' is proper in civil cases where a party has failed to preserve

evidence and there is a showing of bad faith in doing so." *United States v. Lanzon,* 639 F.3d

1293, 1302 (11th Cir. 2011).  As the Middle District recently noted in *Vanliner Ins. Co. v. ABF*

*Freight Systems, Inc*, 2012 WL 750743 (M.D.Fla. March 08, 2012), applying *Lanzon,*

> To establish spoliation, the moving party must prove that (1) the missing or
> destroyed evidence actually existed at one point in time, (2) the alleged spoliator
> had a duty to preserve the evidence, and (3) the "evidence was crucial to the
> movant being able to prove its prima facie case or defense." *Walter v. Carnival
> Corp.,*No.09–20962–CIV–HOEVELER/GARBER, 2010 U.S. Dist. LEXIS
> 74307, at *5 (S.D.Fla. July 22, 2010).  In the absence of direct evidence, bad faith
> can be shown by circumstantial evidence. *Id.*, at *5–6.  Circumstantial evidence
> includes:
>
> > (1) [a showing that] evidence once existed that could fairly be
> > supposed to have been material to the proof or defense of a claim at
> > issue in the case; (2) the spoliating party engaged in an affirmative act
> > causing the evidence to be lost; (3) the spoliating party did so while it
> > knew or should have known of its duty to preserve the evidence; and
> > (4) the affirmative act causing the loss cannot be credibly explained as
> > not involving bad faith by the reason proffered by the spoliator.

8

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

636129.1

*Id.*at.2.   The defendants also rely on the arguments in the next section as support for this claim of spoliation.  They seek a negative inference that the evidence would have been favorable to the defendants, and unfavorable to Barnext Offshore.

**5.**       **Failure to preserve evidence** – Barnext inexplicably seeks to prevent mention that evidence was not properly preserved *following the September 9, 2010 inspection*.  In fact, there is evidence missing from a month earlier, immediately after the August 14, 2010 fire.  The vessel was under the unfettered control of Barnext Offshore's Captain, Mark Alexander, from the time the firefighters left until two or three days later, when it was sent to Cable Marine. While at Cable, it was boarded by representatives of Ward's Marine Electric, who performed work on the critically important Condaria control box.[2]  Servpro Fire Restoration also cleaned portions of its interior.  *Ex. 1,* at p.12.  Masters Marine removed heavy debris from the yacht. (*See Ex. 9*,  <u>Gary Sturm deposition</u> at p. 9).  It was not until August 18 that the control room was finally secured by placing plywood over the door.  *Id.* at 20.  Inexplicably, the written directions to Cable were to clean the vessel immediately.  (*See Ex. 10*, <u>Cable Marine invoice</u>).   After the yacht arrived at Cable, workers immediately began cleaning debris and hooking up air conditioning. *Ex. 9* at 19.  There is no evidence that the yacht was under anyone's exclusive control from when Cable received it until the joint evidence inspection, or that it was ever locked or guarded.

Nobody will ever know exactly what evidence Cable Marine threw away.  The defendants do not dispute that at the joint inspection, some of the parties present agreed to the items that were to be preserved.  The defendants do not agree, however, that all of these items

---

[2] This fact was not provided by anyone until discovered by James Cote, who coincidentally worked at Ward's at the time of the fire. Cote was not involved with the work on the Barnext.  Most importantly, this fact was never disclosed by Barnext or Cable Marine, which maintained that the vessel was immediately secured.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

636129.1

were actually preserved, or that they were available for later inspection.  They were rushed into a crowded joint inspection with 22 participants that was conducted after the scene was already cleaned and sterilized.  Immediately after this inspection, the plaintiff rushed to destroy all evidence not specifically retained.  This was despite the fact that no repair work began for many months thereafter.  Cable's estimate was not even prepared until November 2, 2010 almost 3 months later.  There was no urgency to destroy anything, as Barnext was already preparing to file suit for its fire claim.

There are also unresolved irregularities in the manner in which evidence that was preserved at the September 9, 2010, joint inspection was not made available to the experts at their joint inspection.  The plaintiff made arrangements for expert inspection of what was presumably *all* preserved evidence.  The plaintiff's experts apparently had no need to inspect anything beyond the capacitors, as they did only a cursory investigation of other possible causes of the fire.  The only items made available were the burned control box and a few other items.  None of the electrical tools were provided.  The preserved items were under the joint control of the parties; however, only the plaintiff coordinated their delivery.  Without any prior mention despite the countless emails and correspondence between the parties, the plaintiff recently filed an affidavit of Howard Barnett attesting that three months ago, *he* saw the toolbox from the fire sitting next to a dumpster at the Allied facility.  This wild allegation suggests that the defendants have intentionally destroyed key evidence.  It should not be made lightly, or in vague terms.  The court should conduct an evidentiary hearing before it considers ruling against the defendants on the basis of this specious position.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

636129.1

Barnext's experts attempt to render opinions as to the role of some of this missing evidence, despite the fact that they took no apparent steps to preserve these items.  For example, Tom Long testified that dripping plastic or fiberglass from the ceiling may have caused a secondary fire, even though no analysis was done of any ceiling components, and he did not even know what the composition of the ceiling was.  *See Ex. 5,*  Long depo. at 59, 66-67.  Similarly, Long opined that a spool of fishing line likely caused secondary fires, and that residue on the tool bench where the fishing line and drill had not been available for inspection.  *Id.* at 70, 75.  Long further opined that the door and its seal that led to the pump room had been closed before the fire, but the seal had failed, allowing smoke to exit.  Neither the door nor its seal were available for inspection.  *Id.* at. 122-123.  Even though its own expert rendered opinions based on a failure of the door, Barnext did not preserve that door or its seal.

The defendants have demonstrated that the plaintiff has failed to produce evidence that is critical to the defense of these claims, and central to the opinions of its own experts, but were not available for evaluation of their role in this fire.

**6.**      **Missing witness** – Barnext acknowledges that a Jack Clark performed worked on the air conditioning system of the yacht twice a year (*i.e.*, four times) before the fire. Inexplicably, it was unable to provide any contact information for Mr. Clark, or any other mechanic, beyond his name.   The defendants specifically requested this information by interrogatory, and by questioning Howard Barnett and Alexander in their depositions. (*See Ex. 11*, Howard Barnett deposition at 84; *Ex. 12*, Mark Alexander deposition at 58-59).  Independent investigation by the defendants failed to turn up any certified air conditioning technicians in the State of Florida by that name.  If Barnext has no way to contact this technician whom it regularly

employed to work on its a/c system, it cannot now complain if the defendants comment on his unavailability to testify.  There are other entities that Barnext described only generally, without providing any contact information or records of the work they did.  This includes the other contractors identified above in Barnext's spreadsheet of expenses.  Clark worked on the air conditioning system, the pump room, and likely within the control box, mere hours before the fire.  Because he was available to the plaintiff and not the defendants, a negative inference against Barnext is required.

The United States Supreme Court established the missing witness rule nearly 100 years ago when the Court stated "that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Graves v. United States,* 150 U.S. 118, 121 (1893).   In *Jones v. Otis Elevator Co.,* 861 F.2d 655, 658 (11th Cir. 1988), the Eleventh Circuit laid out the test for a missing witness inference.

> First, the requesting party must establish the potential witness' unavailability in a physical or practical sense; and second, the potential testimony must be relevant and noncumulative. A witness' availability is not determined solely from his physical presence at the trial or his accessibility to subpoena. Rather, availability also will turn on the witness' relationship to the nonproducing party. A witness is unavailable in a practical sense when this relationship is such that it creates bias or hostility against the opposing party. Because of an employee's economic interests, the employer-employee relationship is recognized as one creating practical unavailability. (citations omitted)

*See also, Jones v. Carswell Property Maintenance, Inc.,* 2012 WL 163025 (S.D. Fla. Jan. 19, 2012).   Because the defendants have met this test, they are entitled to an inference that the testimony over the missing technicians, mechanics, and other vendors would have been favorable to them, and unfavorable to Barnext.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

636129.1

7.      **Condaria burn test** – The defendants inadvertently produced this internal burn test document to the plaintiff, which the court ultimately found was not protected under the work product privilege. (ECF # 172).  Barnext questioned virtually every witness at length about this document, including its author, Joe Cusmano.  The video of this test shows Cusmano holding an acetylene torch to various components of the control box, including the high grade industrial latch, which neither melted nor burned.  Indeed, this test was viewed and addressed by Barnext's own experts. (*See, e.g., Ex. 13,* Expert Report of T. Long at 16*; Ex. 5,* Long depo. at 31).  It cannot now claim that this was not made available, or that it was prejudiced in any manner. Plaintiff's own experts cite to, rely upon and discuss the burn test in detail. Because the defendants provided these to their experts, the defendants also produced the report, the video of the tests, and photographs to Barnext. In other words, defendants determined they would use the burn test and its contents at trial and produced it to plaintiff accordingly.  *See*, *Angelucci v. Gov't Emples. Ins. Co.*, 2011 U.S. Dist. LEXIS 119639 (M.D. Fla. Oct. 17, 2011)(discussing the application of the work-product privilege in the surveillance context).

\B. *DAUBERT* **CHALLENGES**

**Introduction** - Barnext desperately challenges every single opinion from each and every one of the defendants' expert witnesses.  Using a shotgun approach, it argues that none are qualified or have reliable opinions. Notwithstanding their collective long histories of serving as expert witnesses and equally lengthy credentials, Barnext would have the Court believe that the defendants went out and found five of the most unqualified people and convinced them to serve as expert witnesses.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

Case No.: 10-cv-23869-Altonaga/Simonton

The defendants will attempt to address the plaintiff's challenges to each expert in sequence. As a preliminary matter, the defendants' experts rendered opinions which are far more reliable than those of Barnext's experts. The ultimate opinion of both James Cote and Richard Henderson is that the origin and cause of the subject fire is undetermined. Coincidentally, this was the same opinion of the first fire and cause origin expert retained by Barnext's insurance carrier. Cote and Henderson rule out the components of the Condaria control box as the origin of the fire, within a reasonable degree of certainty using the scientific method. They do this by assessing the operation and failure modes of capacitors, studying published characteristics of the contents of the control box, and confirming this data through qualitative testing. They also do this by demonstrating that the theory evidenced by their counterparts was impossible, improbable, and contrary to the rigid requirements of NFPA 921. For example, Barnext's experts contend that the fire escaped the control box by melting the latch of the box, yet they made <u>no</u> effort to determine the composition of the latch, or its melting point. Barnext's experts had two exemplar boxes – and could not replicate the incident no matter how hard they tried. Conclusions may not be reached unless alternative possibilities are eliminated. Cote in particular enumerates some of these alternative hypotheses.

Because certain evidence is no longer available, some of these alternatives can no longer be eliminated, due to no fault of the defendants. The defendants are therefore entitled to an inference that the missing exhibits and witnesses would have been favorable to them, and unfavorable to Barnext. Even without this inference, they may render opinions on alternate theories, based upon evidence that is known to have existed. Based upon their training and experience, and the circumstantial evidence available to them, they may also render opinions as

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

636129.1

to evidence which was *likely* to have been present at the scene, even if these alternatives are not expressed within a reasonable degree of certainty.  Finally, expert witnesses have always been able to render opinions based upon hypothetical facts.  Barnext carries the burden of proving that the fire occurred in the control box; the defendants do not have this burden.  The defendants' experts may freely demonstrate how the speculative theory advanced by Barnext's experts is not "more likely than not."

1.      **James Cote** – Unlike the plaintiff's analog James Edmonds, marine electrical engineer James Cote has worked aboard boats for 30 years.  Implicit in the general knowledge of a marine electrician is the prevention and containment of electrical fires on boats.  This includes the installation and placement of fire suppression systems, and proper use of shore-supplied electrical power, and the containment of hazardous electrical equipment in airtight compartments and in fireproof electrical boxes.  James Cote is uniquely qualified to assess the electrical aspects of a boat fire, explain what can happen to a capacitor if its electrical box is left open.  He can also address how this can turn into a damaging fire if the hatch is not sealed, and the fire suppression system is not able to do its job.  In addition to his role as an electrical engineer working on yacht air conditioning problems, Cote has extensive experience in the environment of the systems, such as pump rooms and associated hatches, decks, storage areas, and the like. He has participated in numerous fire cause and origin investigations from an electrical engineering perspective, ruling possible electrical causes in or out, using the scientific method and NFPA 921.  These standards require that the investigator review all available evidence, propose hypotheses, and test these hypotheses.  His ultimate opinion in this case is that the cause

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

of this fire is undetermined.  He then clearly demonstrates how no theory of how this fire began has been proven – by anyone – within a reasonable degree of engineering probability.

Barnext first attacks Cote's qualifications, primarily because Cote "admitted … that he is not a fire cause and origin expert." (D.E. 280-5)  Cote did not "admit" that he was not qualified to render *any* opinions related to fire cause and origin.  An electrical engineer is clearly qualified to render an opinion as to whether a capacitor created a fiery explosion.  In the event the capacitor was the cause of a fire, the engineer would be rendering a *de facto* cause and origin opinion.  Indeed, an engineer would be uniquely qualified to do so.  Cote claims no expertise in fire science, nor did he opine on this.  Nonetheless, he is a member of NFPA, and has taken formal coursework in marine accident investigation.  To the extent that plaintiff contends that Cote's relevant education in this regard is deficient, this goes only to the weight of his testimony, and may be a fertile area for cross-examination.  The result is the same for Cote's training and experience in prior marine fire investigations.  This goes to the weight of his opinions, not their admissibility.

Barnext next faults the "patently absurd burn tests" as a reason to exclude opinions by both Cote and Richard Henderson, PhD.  One test was of Cote putting a propane torch to certain components, while the other was Cusmano's acetylene torch test, addressed above.  Barnext misses the point – both of these tests were qualitative, and used to determine whether these components were flammable at all, and to confirm the published flammability specifications of the components.  (*See Ex. 2*, Henderson depo. at 32-38).  This is clearly more probative than its own experts' opinions, which merely state that the plastic latch of the control box melted, with no testing or data whatsoever.  For example, in *United Fire and Casualty Co. v. Whirlpool Corp.*,

2011 WL4375049 (N.D. Fla. Sept. 22, 2011), the opinion of a fire expert was excluded where he failed to give source for opinion that temperature must have reached a certain level, and he did not attempt to replicate temperature.  In particular, the court held that, "[t]he testing should show not just that the appliance is capable of generating heat, but that such heat is of sufficient magnitude and duration to ignite combustible material."  *Id.* at *2.  Barnext expert Long maintains that the UL94 vertical flammability test must be used to assess flammability, but neither he nor Edmonds used that test themselves.  Moreover, Long is *shockingly* wrong, because section 1.3 of UL94 states:

> The performance level of a material determined by these methods shall not be assumed to correlate with its performance in end-use applications.  The actual response to heat and flame of materials depends on the size and form, and  also on the end-use of the product using the material.

Both Cote and Henderson used these burn tests for one simple purpose, which was to confirm the known data about these electrical components, *i.e.,* that they are not flammable.

Barnext then disingenuously argues that the burn tests are so straightforward that they are not the proper subject of expert testimony.  The point that Barnext misses is that Cote and Henderson did not opine about the flammability of any component; rather, they only confirmed the non-flammability of these electrical components by using published flammability data and a heat source far in excess of whatever may be encountered.  *Id.* at 38-39.

Barnext's biggest worry seems to be with Cote's possible scenarios regarding how the fire might have started.  Cote did not opine that *any* of the particular possible scenarios were in fact the cause because he as he concluded, within a reasonable degree of engineering probability, the cause was undetermined. (*See*, *Ex. 3*, Cote depo. at 246).  His scenarios were the hypotheses which had not been ruled out.  As Barnext quoted Cote, "I cannot find a scenario which I can say

within a reasonable degree of engineering certainty was the cause of this fire." *Id.* at 260.  It was not even possible for Cote to eliminate many of these hypotheses, due to the missing evidence described above.  This evidence includes both the items from the fire and the records of the service performed directly before the fire.  As noted in a case cited by Barnext, an expert may render opinions based upon different theories, even if they are less likely than other theories, provided they have *any* basis in fact.  *Tunnell v. Ford Motor Co.,* 330 F.Supp.2d 731, 742 (W.D.Va.2004).   Each scenario presented by Cote has a factual basis, even if necessarily circumstantial due to Barnext's failure to preserve critical evidence.

In a products liability case under Florida law, a party may establish a *prima facie* cased based on circumstantial evidence.  *See Miller v. Allstate Ins. Co.*, 650 So.2d 671, 673 (Fla. 3rd DCA 1995), citing *Cassisi v. Maytag Co.*, 396 So.2d 1140 (Fla. 1st DCA 1981).   Where the primary physical evidence has been destroyed, circumstantial evidence may be the only evidence available.  *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.20 621,637 (8th Cir. 1972). This principle was recently explored in *Competitor Liaison Bureau v. Cessna Aircraft Co.*, 2011 WL 1150065 (M.D. Fla).  In *Competitor*, no direct evidence was available as to whether a pilot re-energized a plane's weather radar system, as the circuit breaker was destroyed in the accident. In allowing experts to rely on circumstantial evidence, the court relied on *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797,803 (6th Cir. 2000):

> Circumstantial evidence in a products liability case should "fairly indicate a 'logical sequence of cause and effect'…"  The [plaintiff] contend[s] that though the experts differed on where the problem originated, both presented a logical sequence of cause and effect between Plane Perfection's negligence and the aerodynamic instability known as flutter that each concludes caused the crash. "[A]n expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known."  *Pomella v. Regency Coach Lines, Ltd.*, 899 F.Supp. 335, 342

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

Case No.: 10-cv-23869-Altonaga/Simonton

(E.D. Mich.1995), quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 1469 (1993). The expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions. An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. *See Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d. Cir.1990). However, mere "weaknesses in the factual basis of an expert witness' opinion … bear on the weight of the evidence rather than on its admissibility" *United States v. L.E. Cooke Co.,* 991 F.2d 335, 342 (6th Cir.1993).

Because the expert's opinions were based in fact in certain assumptions and circumstantial evidence, the Sixth Circuit ultimately held that the plaintiff "has presented a plausible theory, supported by what evidence there was available, which if believed by a jury could establish negligence." *Id.* at 505; *see also Calta v. North American Arms*, 2007 WL 4800641 at *7 (M.D.Fla) (expert's failure to rule out alternative causes of an incident "would be the proper subject of cross examination, and affect the weight that a jury should give [his] testimony, and not the admissibility of that testimony.").

Barnext's experts did not even attempt to address alternative sources. Instead, they worked backwards from the conclusion that the fire was caused by a defective capacitor in the control box, and only conducted testing which they believed would support that conclusion. This is the antithesis of the scientific method. *See, e.g., Michigan Millers Mutual Insurance Corp. v. Benfield*, 140 F.3d 915 (11th Cir. 1998)(testimony of fire cause and origin expert excluded where he failed to eliminate lamp hanging over fire scene as a possible ignition source).

Barnext faults the defendants with not providing all materials that Cote requested for testing, and faults Cote with making assumptions about evidence which no longer exists. These items were under either Barnext's exclusive control, or joint control. Cote's ability to test the missing evidence was nonexistent, but it does not preclude his ability to address this evidence,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

even though these items were not produced by the plaintiff.  Barnext's attempts to somehow blame either Cote or the defendants are without support.  *See also Calta* (it is appropriate for experts to testify based on hypotheticals).

      **2.**    **Richard Henderson, PhD** -- Barnext contends that Dr. Henderson failed to follow NFPA 921, because he incorrectly recited some of its requirements off of the top of his head, when asked about them in his deposition.  It also attempts to attribute all of his opinions into a three "considerations."  In fact, Henderson is a professional fire cause and origin investigator, and properly followed NFPA 921.  As with Cote, Dr. Henderson's ultimate conclusion is that the cause and origin of the fire were undetermined.  He then demonstrates that there were other possible causes (*i.e.*, hypotheses) that were not ruled out.  He did exactly what is required of a scientist presented with the hypotheses advanced by the plaintiff, *i.e.*, that the fire somehow started in the control panel as a result of a defective capacitor.[3]  He successfully tested that hypothesis to see where it failed to hold true.  He used the process of elimination, but was hampered by the fact that certain known pieces of evidence were no longer available.

Henderson was able to conclude that the materials within the control box could not have supported the amount of flame caused by the subject fire, so that there must have been another fuel source. (*See, Ex. 2,* <u>Henderson depo.</u> at 76-78).  Unlike the expert in *United Fire and Casualty*, he was able to exclude certain sources, based upon known published flammability data about the components involved.  This obviated the need for independent testing of the individual components of the control box, although he nonetheless confirmed these data with the qualitative burn tests conducted by Cote and Cusmano.  This was also addressed in *Daubert*

---

[3] No expert has opined as to any actual defect in the individual capacitors allegedly involved in the subject fire. Though Barnext has not described it as such, its claims sound as a design defect.  As a consequence, reliance on the published characteristics of the components is wholly appropriate.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

itself, where the Supreme Court stated that "[a]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert at 597, see also Certain Underwriters Lloyds v. Bela,* 2009 WL 2848995 (N.D. Ga.).

**Opinions beyond expertise** -- Barnext next challenges Henderson, as well as Cote, for expressing opinions beyond their areas of expertise.  As to Cote, this included his opinions as to whether the door to the control room was properly closed.  Again, this was part of Cote's process of elimination of possible scenarios, and was based upon his extensive experience in marine environments.  Although he was admittedly not an expert on airtight doors, he was able to ascertain whether a door was properly closed or not, and why that is important in a marine electrical enclosure.  This was not his opinion *per se*, but an observation supporting his opinions, based on the circumstantial evidence.  This observation supports the notion that none of the materials found in the electrical control box could have sustained a fire of the extent experienced by the Barnext.  *Id.*   Cote also noted that the vessel had been left unattended prior to the fire, while it was connected to shore-supplied electrical power.  This is a matter uniquely within the expertise of a marine electrical engineer, since Cote is able to explain the types of electrical dangers presented by this hazardous environment.  Cote explained that this hazard was exacerbated, if not created, because the vessel had just undergone mechanical work which had not yet been tested, and it should have been watched until the repairs were proven.  This is the type of advice a marine electrician would typically give after performing electrical work on a vessel.

Henderson also rendered opinions regarding the operation of the vessel's fire suppression system, which had not been inspected in two years.  Barnext urges that Henderson's testimony

should be excluded because there is a factual discrepancy regarding whether the system activated during the fire.  The defendants maintain that there is no competent evidence that the system discharged during the fire, and because of the failure of the system to activate, the fire grew and spread.  Based on vague hearsay, Barnext claims that the system activated after the firefighters were already present, thus demonstrating how it failed to work properly.  This fact goes to the extent of Barnext's damages caused by its own failures.  Nobody has direct knowledge whether the fire suppression system worked as designed to suppress the fire.  This is highly relevant, rather than only "tangentially" related to Dr. Henderson's opinions, as Barnext argues.  Barnext's challenge to Henderson's opinion that an open pump room door would have compromised the effectiveness of the system is difficult to understand, in light of Dr. Henderson's education, training, and experience as to how fires spread.

      **3**.     **Neil Maclaren**—Barnext's challenge to marine surveyor Neil Maclaren is difficult to understand, as Maclaren did everything that a marine surveyor normally does.  He surveyed the Barnext after the fire, and again prior or issuance of his report, to determine the extent of damages, and ascertain the scope of repairs needed.  He specifically worked with Sparrow to reach an agreement with Barnext on the scope of repairs for the repair agreement. While he did not render an exact number as to the cost of repairs, that was not necessary.

      Barnext never demanded repair of the vessel.  It consistently took the position that the vessel was ruined, and beyond repair.  Maclaren established that it was completely repairable, that the repairs agreed upon were all that were needed to return the vessel to service, that the repairs would take about 3-4 months, and that the cost of the repairs were in line with the value of the vessel.  As Maclaren explained in his deposition (*Ex. 14*, at p. 7),

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE (305) 374-4400 • FACSIMILE (305) 579-0261

> It's custom and practice when you do casualty surveys to give –
> depending – sometimes people want cause, nature and extent of damage.
> This is just the nature and extent of damage and with that goes cost,
> estimated cost.

**4.     Roy Sea**— As with all of the other defense experts, Barnext seeks to limit yacht

broker Roy Sea, based upon its claim that Sea's opinions are speculative.  Mr. Sea has 28 years

of experience in the valuation of yachts, and is eminently qualified to render such opinion as to

the value of a yacht.   Barnext argues that Sea's reference to his "intuition" in ascertaining

depreciation somehow invalidates his opinions.   In fact, Sea explained that intuition in his

deposition (*Ex. 15*, at p. 64),

> Basically, I can look at any type of boat for any period of time and get a feel for
> what's happening with prices. And I probably went through 500 Internet pages
> looking at that.  So, the 15 percent is a composite number for a boat that declined
> less than other boats.

Mr. Sea gives a very straightforward analysis of his methodology.  He researched the

market, looking at hundreds of yacht listings.   Using his years of experience and training, he

determined which listings were comparable, and then made adjustments in their values based on

various factors (age, condition, American v. European, etc.).   He made certain adjustments for

intangibles, again based on his training and experience.

So desperate is Barnext to challenge Roy Sea that it even disputes that the purchase price

of the yacht was its fair market value.   Because Sea described the sale as an "arms length

transaction," it was by definition sold for fair market value.   Barnext contends that this is

"unsound methodology," and a basis to exclude all of his opinions.   It challenges Sea's

estimation of stigma damages from its prior grounding incident, then challenges Sea's *lack* of

finding stigma damage from the fire damage, concluding, as with all of his other opinions, he

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

simply made up the number.  (D.E. 280-54).  Coincidentally, even professional marine surveyor Joel Sparrow thought that there would be no such stigma damage if the repairs were done properly. (*See Ex. 1*, <u>Sparrow depo</u>. at 42).  Barnext simply ignores the amount of work Sea did to reach his conclusions.

As to the grounding incident, Sea knew that significant hull damage was repaired, which was not reported to Pershing.  As Pershing's representative testified, this would have voided the 5 year hull warranty.  The ship was built under rigorous RINA certification standards, which adds to its value.  The grounding incident caused a 12" hole in the hull, according to Howard Barnett.  Sea learned that this break compromised the hull's structural integrity, requiring repairs of the stringers and patching from inside, within the fuel tanks themselves.  RINA promulgates rigorous repair standards, which must be followed if RINA certification was to be maintained.  Sea did not know exactly what RINA specified, as he readily admitted he was not a repair expert.  He is, however, an expert on the value of yachts.  Based on his extensive experience and training, he is competent to know that if a yacht loses its RINA certification, and loses its warranty, these factors negatively impact its value.  The fact that Sea did not definitely know that either had occurred during his deposition does not matter, as these are no different from hypothetical questions.  Defendants will prove both at trial, after which Sea may clearly render opinions based on these facts.

Sea also readily acknowledged that a 10% reduction in value "is not an exact number."  It needn't be.  In fact, it cannot be.  All that an appraisal can do is estimate a value.  A particular buyer or seller could be more motivated than another, which would affect the sale price, and hence the actual fair market value.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

Barnext faults assessment of the lack of smoke odor after the fire repairs were completed. Howard Barnett's biggest concern has been that the yacht would always smell like smoke. Sea acknowledged that odors can negatively impact a yacht's value. It would appear that Barnext faults the defendants' experts regardless of whether they perform testing or not. In this instance, Sea performed an important qualitative test, even bringing an extra set of the most accurate device known to determine whether the yacht has a smoke odor—the human nose. Because it did not have any odor, Sea did not adjust the value downward based on this factor.

Overall, Sea's opinions are based upon his evaluation and comparison of comparable vessels in the market, making adjustments for their differences. While Barnext may not agree that the other vessels were indeed comparable, that is the main area of cross-examination of an appraiser in any trial. *See, e.g. Quiet Technology DC-8 v. Hurel-Dubois U.K. Ltd.*, 326 F30 1333 (11th Cir. 2003) (inadequacies in studies goes to weight of expert's opinion, not admissibility); *Bazemore v. Friday*, 478 U.S. 385 (1986). Barnext's own valuation record, Jason Dunbar, selected vessels of vastly different qualities and sizes as comparables in his valuation opinions, which doesn't merit the scrutiny of a *Daubert* inquiry. In fact, the defendants have raised a *Daubert* challenge against Dunbar on a completely unrelated basis.

**5.      Captain Tom Danti** – Tom Danti is a highly qualified seamanship expert, whom Barnext elected against deposing. He is a licensed captain and an instructor on seamanship. His report and C.V. are attached hereto as *Ex. 16*. Barnext claims Danti renders opinions on irrelevant subjects, which would confuse a jury and be prejudicial (D.E. 280-56). Danti renders focused opinions which form the basis of many of the defendants' affirmative defenses. Though not cited by Barnext, it seems to make a Rule 403 argument. In summary, Danti's opinions are

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

636129.1

that Barnext improperly failed to maintain or inspect its fire suppression system, should have kept all hatches closed, should not have kept combustibles in the pump room, and should not have left the vessel unattended and connected to shore power right after having serviced it.

One of Barnext's challenges is that it is "unfathomable how Danti could maintain that Dr. Kramer, a fact witness in this case, somehow owed a duty to use common sense and good seamanship." *Id.* Of course Kramer owed such a duty, pursuant to the undertaker's doctrine. A duty may arise from the general facts of a case when one undertakes to provide a service to others and "thereby assumes a duty to act carefully and not to put others at an undue risk of harm." *Clay Elec. Coop., Inc. v. Johnson,* 873 So.2d 1182, 1185 (Fla.2003), Restatement (Second) of Torts § 324A (1965).

Dr. Kramer, with 50 years of yachting experience, claims he opened the pump room door, saw flames, and left. He neither closed the door nor manually activated the fire suppression system. Instead, he ran to save his own yacht rendering the fire suppression system useless, and leaving a small contained fire with no previous source of oxygen to turn into the mess that engendered this lawsuit. This is hardly irrelevant. Had Kramer not undertaken the duty to check on the fire, it would have simply suffocated from the lack of oxygen and from the activation of the fire suppression system if one believes Barnext and its captain that the pump room door was closed and locked the evening before. Claiming that Danti lacks any expertise in such systems is an unsupportable position. As a yacht captain, Danti is responsible for the maintenance and operation of *all* systems on the vessel under his command.

## C.     CONCLUSION

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

Case No.: 10-cv-23869-Altonaga/Simonton

The defendants have demonstrated that all evidence which the plaintiff seeks to exclude should in fact be admissible at trial, and that the defendants' experts are competent to express all opinions consistent with their reports and deposition testimony.

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**
Attorneys for the Defendants
3800 Bank of America Tower
100 SE Second Street
Miami, Florida 33131
Tel:    305.374.4400
Fax:    305.579.0261


By:  /s/ Walter G. Latimer
        Walter G. Latimer
        Florida Bar No.  679097
        walter.latimer@wilsonelser.com
        Russell M. Pfeifer
        Florida Bar No. 659861
        russell.pfeifer@wilsonelser.com


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed with Clerk of the Court by using the CM/ECF system this  23rd  day of March, 2012 to all counsel or parties of record on the service list.

                /s/ Walter G. Latimer
                Walter G. Latimer

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
100 SOUTHEAST SECOND STREET • SUITE 3800 • MIAMI, FLORIDA 33131
TELEPHONE  (305) 374-4400 • FACSIMILE  (305) 579-0261

636129.1