IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 10-cv-23869-Altonaga/SIMONTON

BARNEXT OFFSHORE, LTD.,

      Plaintiff,

v.

PERSHING, SpA, CRN, SpA, FERRETTI GROUP
USA, INC. n/k/a ALLIED MARINE, INC.,
CONDARIA 87 Srl and DOMETIC CORPORATION,

      Defendants.

_____/

**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION IN *LIMINE***

Plaintiff, BARNEXT OFFSHORE, LTD. ("Barnext"), files its Reply in Support of Plaintiff's Motion in *Limine*, [ECF No.s 279, 280], and states as follows:

**I.      Insurance Coverage and Failure to Make a Claim.**

Defendants plan to introduce evidence of Barnext's insurance coverage and purported failure to make an insurance claim[1] solely for the purpose of showing lack of mitigation of damages.  But in *Florida Drum Company v. Thompson ("Thompson II")*, 668 So. 2d 192 (Fla. 1996),[2] a case Defendants ***cite to***, the Florida Supreme Court held that it is error to allow a jury

---

[1] To correct the record, Barnext ***did*** make a claim with its insurance company, but dropped the claim after Defendants convinced Barnext to allow them to conduct the repairs on the vessel Barnext (the "Yacht").  *See* (Sparrow Dep. 46:4–47:5); (Marciano Dep. 181:25–184:22); *see also* (Comp. Ex. N to [ECF No. 250, Statement of Material Facts in Opposition to Defendants' Motions for Summary Judgment], which was redacted and filed under seal).  All deposition transcript excerpts referenced here are attached as Composite Exhibit "1".

[2] "In a diversity case, the determination of damages is a substantive issue governed by the law of the forum state."  *Miller ex rel. Miller v. Ford Motor Co.*, No. 2:01CV545FTM-29DNF, 2004 WL 4054843, at *5 (M.D. Fla. July 22, 2004).

to be appraised of a plaintiff's access to insurance coverage or failure to make an insurance claim in order to show lack of mitigation of damages.[3] *Thompson II* is dispositive here, and precludes Defendants from introducing evidence of Barnext's insurance coverage or purported failure to make an insurance claim for the purpose of showing lack of mitigation of damages.

Moreover, the fact that Barnext will be introducing evidence of Defendants' unjustified delay in repairing the Yacht in order to prevail in its loss of use claim does ***not*** render evidence of Barnext's insurance coverage admissible.  The issue of repair delays is a narrow one, and Defendants may not transform that narrow issue into a gaping door where they can impermissibly suggest that Barnext's purported failure to make an insurance claim limits their liability.  Yet this is precisely what Defendants seek to do, arguing that "[i]t would be virtually impossible to try this case without reference to Barnext's insurance coverage."[4]  To support that dubious statement, Defendants point to certain testimony by Joel Sparrow, the marine surveyor

---

[3] The Supreme Court cited with approval the rational of the district court below, which is instructive here:

> Florida has long recognized the concern in negligence cases that the jury's knowledge of a defendant's insurance coverage may result in the jury attributing liability where none exists, because of sympathy and the belief that the financial burden would not be born by the defendant.  The same potential for improper jury influence has been found to exist when the plaintiff has insurance coverage available to ameliorate the loss*.  **Had Thompson chosen to seek recovery from his insurer, it would have been no benefit to Pensacola Shipyard, because it could not have set off the insurance coverage against its own financial liability. It is not a material fact in this case that Thompson could have called upon his insurer to provide money to pay for repairs possibly expediting the work and reducing the exposure to further damage. Pensacola Shipyard could have accomplished the same result by immediately repairing the boat and maintaining its position that Thompson was responsible for all of the repairs.***

*Thompson v. Florida Drum Company ("Thompson I")*, 651 So. 2d 180, 181–82 (Fla. 1st DCA 1995) (emphasis added) (internal citations omitted).

[4] [ECF No. 303 at 2].

for Barnext's insurance carrier, concerning the preservation of the fire scene and probable success of the Yacht repairs;[5] and facts surrounding the grounding of the Yacht that occurred more than a year **before** the subject fire.[6]   None of these issues, however, have **anything** to do with Barnext's alleged failure to make an insurance claim in this case or mitigation of damages. Furthermore while a jury could, by virtue of common sense, infer from those facts that the Yacht may have been insured, Defendants may not **affirmatively** state the fact of insurance coverage to argue that Barnext's purported failure to make an insurance claim reduces Defendants' liability. *See Thompson II*, 668 So. 2d at 193; *Thompson I*, 651 So. 2d at 181.   In sum, all evidence of Barnext's insurance coverage or Barnext's purported failure to make an insurance claim should be ruled inadmissible.

## II.      Wealth of the Parties.

Defendants do not challenge the exclusion of evidence concerning the wealth of Barnext or its principal, Howard Barnett.   As such, Barnext's Motion in *Limine* should be summarily granted in this respect.   It should be noted, however, that contrary to Defendants' off-hand comment, evidence of the wealth of nonparties **can** be excluded as prejudicial and irrelevant. *See Royal Marco Point 1 Condo. Ass'n v. QBE Ins. Corp.*, No. 2:07-cv-16-FtM-99SPC, 2011 U.S. Dist. LEXIS 14521, at *22 (M.D. Fla. Feb. 2, 2011) (in suit by condominium association,

---

[5] To correct the record, contrary to Defendants' assertions, Sparrow never testified that the Yacht could be repaired without any loss in value due to fire stigma.   Rather, Sparrow stated that "the fire is ***always going to be attached to the boat***," and that the larger is whether the boat was repaired by qualified people—presumably by Pershing personnel—and in a proper manner in order to be restored to pre-loss condition.   (Sparrow Dep. 42:1–15) (emphasis added).   Jason Dunbar, Barnext's valuation expert, also explained that the Yacht will always carry a fire stigma regardless of repairs.   *See* (Dunbar Dep. 81:1–20).   And as another correction, contrary to Defendants' apparent suggestion, Gary Strum, who is Cable Marine's manager, testified that Cable Marine's delay in completing its repair estimate was caused by ***Defendants' failure*** to provide Cable Marine with information regarding parts.   *See* (Strum Dep. 30:15–33:22).
[6] [*Id.*]; *see* (Sea Dep. 25:15–20) (noting correct date of grounding).

3

excluding evidence of wealth of condominium owners designed to paint the owners as rich and over-demanding).  The Court should likewise forestall introduction of any evidence of wealth in this case, which likely would also be used to portray Mr. Barnett as rich and over-demanding.

## III.   Offers to Compromise and Settlement Negotiations.

Defendants agree with Barnext that evidence of offers to compromise and settlement negotiations should be inadmissible in this case under Federal Rule of Evidence 408.  Thus, as a preliminary matter, Barnext's Motion in *Limine* as it pertains to offers to compromise should be granted.  Defendants, however, then proceed to argue there are "related issues . . . to which this general rule should not apply."[7]  Defendants offer two issues: (1) Barnext's demand for repairs under the warranties, and (2) the failed contingency within the Mediation Agreement reached by the parties on June 7, 2011.[8]  Defendants' purported exceptions, however, are meritless.

First, concerning Barnext's repair demand, this issue has already been disposed of on summary judgment by the Court in favor of Barnext.[9]  Accordingly, no such issue exists in this case that would serve as an exception to Rule 408. Second, concerning the Mediation Agreement, the failed contingency under the Mediation Agreement clearly does not meet the exception under Rule 408 for negating a contention of undue delay.  Defendants argue that the contingency under the Mediation Agreement "**unexpectedly** failed to materialize," which then allegedly caused a ***month-long*** delay in the shipment of parts.[10]  Defendants, however, fail to inform the Court that the Mediation Agreement contingency expired on ***June 15, 2011***, ***just 8***

---

[7] [ECF No. 303 at 3].
[8] Defendants incorrectly state that the mediation occurred on June 2010.
[9] *See* [ECF No.  290 at 8–9 (granting summary judgment on Defendants' twentieth affirmative defense: failure to provide "timely notice of a claim under the warranties or the opportunity to cure the problem.")].
[10] [ECF No. 303 at 4 (emphasis added)].

*days after the conclusion of the mediation*.[11]  Moreover, the contingency to void the Mediation

Agreement was unilaterally exercised *by Defendants*,[12] whohad the *sole, unbridled discretion* as

to whether to exercise that contingency.[13]  As such, Defendants' contention that their exercise of

a contingency set to expire in eight days was "unexpected" and caused a month-long delay is

frivolous at best and disingenuous at worst.

In the alternative, if Defendants are allowed to twist the Mediation Agreement into a Rule

408 exception, then Barnext should also be allowed to inquire into the circumstances

surrounding Defendants' decision to exercise the settlement-killing contingency.   This

alternative scenario is raised to the Court's attention because Defendants have attempted in the

past to shield privileged settlement communications from disclosure when it is convenient to

their position.[14]   Defendants, however, cannot use insurance coverage and settlement

negotiations as both a sword and a shield.  In sum, all evidence regarding offers to compromise

and settlement negotiations should be inadmissible to the extent provided by Rule 408.

## IV.     Repair Agreement and Evidence of Repairs.

Defendants' attempt to use the Confidential Repair Agreement ("CRA")[15] and other

evidence of the Yacht's repair "as evidence that there is *no additional damages available*"[16] runs

contrary to the letter and spirit of the CRA and relevant Florida law.  Under paragraph 10 of the

---

[11] [ECF No. 135 at 1].

[12] *See* [ECF No.s 137 at 1–2; 143 at 2; 145 at 3].

[13] *See* paragraph four of the Mediation Agreement, a redacted copy of which is being filed under seal as Exhibit "2" hereto.

[14] *See* (Marciano Dep. 181:25–184:22) (moving to strike the testimony of Frank Marciano, a representative of Dometic, regarding the circumstances of the negotiations of the repair agreement, elicited in order to contradict Dometic's position that Barnext should have repaired the Yacht through his insurance company in order to mitigate damages).

[15] A copy of the Confidential Repair Agreement has been filed under seal.  *See* [ECF No.s 275, 277].

[16] [ECF No. 303 at 5].

CRA, Barnext specifically agreed to release Condaria and Ferretti of all claims for **repair costs**.[17]
Barnext, however, did **not** waive "all **other claims** and causes of action which have been or
would be asserted in the Litigation, **as well as applicable damages recoverable . . . to the extent
otherwise viable and permissible pursuant to applicable law**."[18]

Here, "pursuant to applicable law," damages separate and apart from repair costs may be
recovered by Barnext.  For instance, under Barnext's post-sale failure to warn claim,[19] Barnext is
entitled to recover damages in the amount of the "diminution in value [of the Yacht] **after**
repairs."  *See Merrill Stevens Dry Dock Co. v. Nicholas*, 470 So. 2d 32, 33 (Fla. 3d DCA 1985)
(emphasis added).  In addition, under its warranty claims, Barnext is entitled to recover "the
difference at the time and place of acceptance between the value of the goods accepted and the
value they would have had if they had been as warranted, unless special circumstances show
proximate damages of a different amount."  *Ames v. Winnebago Indus., Inc.*, No. 5:04-CV-
359OC10GRJ, 2005 WL 2614614 (M.D. Fla. Oct. 14, 2005) (quoting § 672.714, Fla. Stat.).
Barnext's warranty claims would also allow recovery for loss of use.  *See Miles v. Kavanaugh*,
350 So. 2d 1090, 1093 (Fla. 3d DCA 1977).  Finally, under its FDUTPA claim, Barnext may
recover its "actual damages," e.g., "the difference in the market value of the product or service in
the condition in which it was delivered and its market value in the condition in which it should
have been delivered according to the contract of the parties," unless "the product is rendered
valueless as a result of the defect."  *Gastaldi v. Sunvest Resort Communities, LC*, 709 F. Supp.

---

[17] (Confidential Repair Agreement ¶ 10).
[18] (*Id.*) (emphasis added).
[19] While the Court applied the economic loss rule to the bulk of Barnext's non-statutory tort
claims, the economic loss rule does not apply to Barnext's post-sale failure to warn claim.  *See*
[ECF No. 253 at 3 (citing *Sbarbaro v. Yacht Sales Int'l, Inc.*, No. 94-1062-CIV, 1995 WL
822628, 1996 A.M.C. 133, 144 (S.D. Fla. Oct. 10, 1995))].

2d 1299, 1306 (S.D. Fla. 2010).  By its plain meaning, the CRA cannot be used to prevent Barnext from seeking the damages outlined above.

To be sure, Defendant's continued reference to Paragraph 12 of the CRA, which states that the CRA *may* be introduced in this litigation,[20] does not give Defendants the right to ignore the other provisions of the CRA.  It is black letter law that the Court must "give[] a realistic, plain-language meaning to the words of the contract, and construe[] the contract as a whole, giving effect to all its provisions, in a manner which accords with reason and probability." *Gulf Power Co. v. Coalsales II, L.L.C.*, 661 F. Supp. 2d 1270, 1275 (N.D. Fla. 2009).  Paragraph 12 of the CRA cannot be read in a vacuum, but must be read in *pari materia* with Paragraph 10.  In other words, while the CRA *may* be admissible in this litigation in general, it is ***not*** admissible for Defendants' express intention of prejudicing Barnext's claims to damages that were expressly ***preserved*** under the CRA.  Accordingly, evidence of the CRA or other evidence of Yacht repairs should be excluded.

**V.      Spoliation of Evidence.**

Defendants have been given every opportunity to set forth sufficient evidence of spoliation to submit that issue to a jury.  Now, in their last submission on the subject, Defendants proffer two categories of allegedly spoliated evidence: (1) miscellaneous and at times unidentified tools and other items, and (2) unidentified Yacht maintenance records.  This proffer, however, only serves to highlight how untenable this trial will be if Defendants are allowed to level baseless accusations of spoliation in order to taint a jury against Barnext.

First, concerning the miscellaneous tools, Defendants' arguments are markedly contradictory and indefensible, falling far short of any proper showing of spoliation.  For

---

[20] *See* (Confidential Repair Agreement ¶ 12)

7

example, while Defendants maintain that the subject tools were spoliated, they then recognize that the tools were listed by Mr. Barnett in a "quick list" as having been *lost in the fire*.[21] Clearly, if some of the tools were destroyed in the Yacht fire, then they were *not* spoliated by Barnext.  Moreover, although Defendants identify an electrical crimping tool as an allegedly missing tool "necessary to determine the origin and cause of the fire,"[22] they then admit in the following page that "this tool would *not have caused the fire*."[23]  Indeed, the electrical crimping tool is not the only item identified by Defendants that is irrelevant to the cause and origin of the Yacht fire, as *Defendants'* fire cause and origin expert, Richard Henderson, effectively eliminated *every tool and combustible that was actually present* in the pump room as a possible fire source or contributor.[24]  The only things Henderson could not eliminate as contributing to the fire are certain materials that Henderson himself admitted are "*unknown*,"[25] and the drill that Defendants deem "noteworthy."   Yet contrary to Defendants' spoliation claim, the drill *was* available during the September 9, 2010 joint inspection, and Defendants had every opportunity to preserve that drill if they wanted to.[26]  Moreover, it is baffling how Defendants could claim that the toolbox that was present in the pump room was spoliated by Barnext considering that Mr. Barnett signed an affidavit *attesting* to the fact that the toolbox was under *Defendants' control, and then subsequently thrown away by Defendants*.[27]   Notably, Defendants offer *no*

---

[21] [ECF No. 303 at 6; 303–7].
[22] [ECF No. 303 at 5].
[23] [ECF No. 303 at 6 (emphasis added)].
[24] [ECF No. 280 at 28–29, 34].
[25] [ECF No. 280 at 34].
[26] *See* [ECF No.s 279 ¶ 6; 280 at 31–32]
[27] *See* [ECF No. 279–1].

8

affidavit to the contrary—or **any** record evidence for that matter—to support their opposition.[28] In short, if Defendants cannot put forth on paper a lucid, coherent argument for spoliation of evidence that is supported by the record, then they should not be allowed to confuse a jury with unfounded attacks against Barnext.

Second, concerning the unidentified Yacht maintenance records, Defendants' sole authority for their spoliation of evidence argument, *Vanliner Ins. Co. v. ABF Freight Sys., Inc.*, No. 5:11-CV-122-OC-10TBS, 2012 WL 750743 (M.D. Fla. Mar. 8, 2012), could not be more **fatal** to their claim. In *Vanliner*, a defendant/crossclaimant moved for spoliation sanctions against the crossdefendant/owner of a tractor that was involved in an accident for allegedly failing to download electronic maintenance data ("ECM data") from the tractor's engine. *Id.* at *1. The court denied the motion, explaining, *inter alia*, that the maintenance records for the tractor were produced, and that "[w]hether the ECM data contained information that was not already in the maintenance report [was] **speculative**." *Id.* at *3.

Here, as in *Vanliner*, Barnext produced **all** maintenance records for the Barnext in its possession, which included the Yacht's maintenance logs, as well as a spreadsheet of expenses, maintenance schedules, petty cash logs, several invoices, printouts from the Yacht's maintenance software, and hours logs.[29] Thus, Defendants' representation that "plaintiff failed to produce *any* maintenance records of the vessel"[30] is plainly wrong. In addition, contrary to Defendants'

---

[28] Ironically, Defendants accuse Barnext of making a "wild allegation" of spoliation that "should not be made lightly, or in vague terms." [ECF No. 303 at 10]. But even a cursory glance at Defendants' spoliation charges shows that it is Defendants who are making wild allegations based on nothing but conjecture and innuendo.

[29] A copy of all the referenced maintenance documents are attached here as Composite Exhibit "3".

[30] [ECF No. 303 at 7 (emphasis in original)].

9

assertion, Mr. Barnett, Captain Alexander, and Peter Hopwood—one of Mr. Barnett's yacht brokers—testified as to the much touted paint-job performed by Apex Marine, LLC ("Apex").[31]

And regarding the Apex paint-job in particular, as shown in Defendants' Exhibit 7 (Barnext's Response to Dometic's Request for Production), Barnext specifically stated that "[a]ny repair, maintenance, or service records would be in the ***possession of the entity who performed any such services*** . . . ."[32]  Apex would be such an entity.  Moreover, Defendants fail to note that Barnext served on Ferretti the ***same discovery response*** on April 4, 2011,[33] which included the production of the spreadsheet of expenses that Defendants ***rely on*** to show that Apex was paid for the paint job on August 14, 2010.[34]  Notably, the discovery cutoff in this case was on December 8, 2011,[35] which means that Apex's work was disclosed to Defendants ***8 months before the discovery cutoff***.[36]  Thus, if Defendants indeed "did not obtain the records of Apex Marine until after the close of discovery,"[37] that is entirely their fault.

Regardless, Defendants ***did*** in fact obtain Apex's service records, which are attached as Exhibit 8 to Defendants' Response.[38]  The service records show exactly what work was performed on the Yacht—a paint job and certain warranty work—which is consistent with the testimony of Mr. Barnett, Captain Alexander, and Hopwood.[39]  Importantly, the service records

---

[31] (Alexander Dep. 80:20–81:20); (Barnett Dep. 79:12–81:5); (Hopwood Dep. 115:25–117:8).
[32] [ECF No. 303–7 at 5].
[33] A copy of Barnext's Response to Ferretti's Request for Production is attached here as Exhibit "4".
[34] [ECF No. 303 at 8]; *see* (Ex. 3 at BNXT001205).
[35] *See* [ECF No. 158 ¶ 6(c)].
[36] Barnext's Response to Dometic's Request for Production was also served well before the discovery cut-off, on July 25, 2011.  [ECF No. 303–7 at 8].
[37] [ECF No. 303 at 7].
[38] [ECF No. 303–8].
[39] *See* (Alexander Dep. 80:20–81:20); (Barnett Dep. 79:12–81:5); (Hopwood Dep. 115:25–117:8).

10093864.1

indicate that the warranty work was done at the authorization of Richard Murray,[40] who is a service manager for either Ferretti or a related entity.[41]  It is thus inconceivable how the work done by Apex on the Yacht is a mystery to Defendants.

Defendants simply have no basis, aside from pure conjecture, to assume that there was any additional undisclosed work.  *See Vanliner*, 2012 WL 750743 at * 3.  Nor do Defendants have any basis for assuming that additional documents showing such work exist in the first place. *See Alstom Power, Inc. v. Norfolk Southern Ry. Co.,* 154 Fed. Appx. 365, 373 (4th Cir. 2005) (no spoliation where party assumes the existence of documents not produced but offers no record evidence to support the assumption); *Tri-County Motors, Inc. v. American Suzuki Motor Corp.,* 494 F. Supp.2d 161, 177 (S.D.N.Y. 2007) ("[S]peculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence.").  Moreover, even assuming such documents exist, Defendants offer no evidence or substantive explanation regarding (1) Barnext's duty, if any, to preserve those documents; (2) the relevance of those documents to a fire cause and origin determination; or (3) the "affirmative act" Barnext supposedly engaged in to supposedly destroy this evidence.  *C.f. Vanliner*, 2012 WL 750743 at *2–3 (setting forth the elements of spoliation of evidence).  In sum, Defendants have twisted the meaning of spoliation of evidence beyond recognition, and intend to convolute this trial with a conspiratorial tale of spoliation absent any nonfrivolous basis.  The Court should not allow such a practice.

## VI.    Failure to Preserve Evidence.

---

[40] *see* [ECF No. 303–8]
[41] (Murray Dep. 5:20–6:4).

In an unprecedented "about-face," Defendants now claim, ***more than a year and seven months*** after the September 9, 2010 joint inspection, that there were irregularities in the inspection, preservation, and later examination of items from the Yacht pump room.[42] Defendants offer ***no*** record evidence whatsoever to support such an allegation. By contrast, Barnext outlined in ***six pages*** the propriety of the procedures of the joint inspection, and most importantly, Defendants' ***lack of objection thereto and subsequent failure to conduct their own testing on the items preserved***.[43] Defendants' position to the contrary is plainly frivolous, and its only purpose is to, again, paint Barnext in a negative light without any supporting facts.

Moreover, Defendants' continuous references to the post-fire actions by Ward's Marine Electric ("Ward's") and SERVPRO Fire Restoration ("SERVPRO") are inapposite and misconstrue the record. Sparrow testified that Ward's merely did an initial inspection of the electrical damage to the Yacht in order to ensure that there was no recurring fire, and that SERVPRO ***did not even enter the pump room*** where the fire originated, but cleaned debris in other interior areas of the Yacht.[44] Strum testified to the same effect, and confirmed that the clean-up work inside the pump room began ***after*** the September 9, 2010 joint inspection.[45] Thus, it is evident that Strum's "clean up" instructions in the Cable Marine Invoice attached as Exhibit 10 to Defendants' Response[46] did ***not*** refer to the pump room. In addition, as evident from the above, this cleanup process was ***not*** coordinated by Barnext, but by either Sparrow or Strum. Accordingly, not only are Defendants' claims of impropriety unfounded, but they are entirely

---

[42] [ECF No. 303 at 9–10].
[43] [ECF No. 279 ¶ 6].
[44] (Sparrow Dep. 12:18–13:17).
[45] (Strum Dep. 8:6–10:21); *see also* (Sparrow Dep. 78:8–21, 79:12–80:8) (plywood securing pump room removed during joint inspection, with no signs of tampering inside).
[46] [ECF No. 303–10].

inconsequential since they were beyond Barnext's control.  Plainly, Defendants have no basis for alleging that there were any irregularities in the inspection, preservation, and later examination of items from the Yacht pump room.

## VII.   Missing Witness.

As was the case with their spoliation of evidence argument, Defendants' sole authority in support of their imposition of the "missing witness rule" is actually detrimental to their position. As explained in *Jones v. Otis Elevator Co.*, 861 F.2d 655, 658–59 (11th Cir. 1988), whether a "party has it peculiarly within his power to produce witnesses" will often turn "on the witness' relationship to the nonproducing party."   One such relationship that creates practical unavailability is the employer-employee relationship; thus, in *Jones*, the Eleventh Circuit applied the missing witness rule where two defendants failed to call three of their ***employees*** that were involved in the maintenance of a defective elevator.   *Id.* at 659–60.  By contrast, the missing witness rule does not apply to third parties that are not employed or controlled by the party against whom the rule is being applied.   *See Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1049 (5th Cir. 1990) ("missing witness rule" inapplicable against Wal-Mart in a slip and fall case due to their failure to call as a witness a doctor who examined the plaintiff at the recommendation of Wal-Mart's orthopedic consultant because the doctor was not employed or controlled by Wal-Mart, but maintained a separate professional practice).

Likewise, in this case, the purportedly missing Jack Clark is not employed or under the control of Barnext; rather, he is a free-lance air conditioning technician that performed some discrete de-scaling work on the Yacht.[47]  Barnext provided Defendants with all the information it

---

[47] *See* (Alexander Dep. 58:4–59:19); (Barnext Dep. 84:4–22).

had in its possession on Clark.[48]  Defendants' belief that Barnext should dig up more information on Clark is untenable; Barnext is ***not*** required to ***search*** for Clark's whereabouts on behalf of Defendants.  If Defendants' own investigatory methods are deficient, that is neither Barnext's concern nor the concern of this Court.  As such, any reference to Clark as purportedly missing is entirely baseless and would, once again, only serve to cast disparagement on Barnext.

## VIII.   Condaria Burn Test.

Defendants' response regarding the Condaria Burn Test seems to be: "no harm, no foul." Defendants do not dispute that they successfully petitioned this Court to deem the Condaria Burn Test privileged work product, while surreptitiously supplying that test to its experts.[49]  Rather, they contend that because Barnext ***eventually*** was allowed access to the Condaria Burn Test, there is no prejudice.  Defendants' position, however, is supported by no authority, and in fact, is contrary to the doctrine of judicial estoppel.  Under the Eleventh Circuit, a party may be estopped from advancing a position in court if (1) the party successfully maintained an inconsistent position under oath in a prior proceeding, and (2) the inconsistent position was designed to make a "mockery of the judicial system."  *See Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273–76 (11th Cir. 2010) (applying judicial estoppel where debtor, by failing to update her bankruptcy schedule to reflect a pending claim against her employer, "represented that she had no legal claims to the bankruptcy court while simultaneously pursuing her legal claim against [the employer] in the district court," which the court held made a "mockery of the judicial system" given the debtor's pecuniary motivations for nondisclosure).  Here, as set forth in Barnext's Motion in *Limine*, Defendants successfully maintained a work production objection

---

[48] See (*id.*).
[49] *See* [ECF No. 279 at 10].

14

over the Condaria Burn Test based on misrepresentations **under oath**.[50]  As a result, Barnext's

counsel lacked the ability to properly examine Cusmano or any other persons concerning the

Condaria Burn Test, which the testimony of Defendants' experts could not cure.[51]  As a result,

Defendants made a "mockery" of this Court through express statements in open court, and

thereafter by the result of their actions.  Defendants should thus be precluded from using the

Condaria Burn Test at trial.

IX.    **Daubert Challenges.**

       a.    *James Coté and Richard Henderson.*

It is Defendants' position that Coté and Henderson, "based upon their training and

experience, and the circumstantial evidence available to them," can "render opinions as to

evidence which was *likely* to have been present at the scene, **even if these alternatives are not**

**expressed within a reasonable degree of certainty**."[52]  In other words, Defendants propose that

Coté and Henderson may render opinions that are **admittedly** speculative based solely on their

*ipse dixit* and on less than "good grounds."  In one fell swoop, Defendants have violated the

basic tenets of the admissibility of expert testimony.  *See Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993); *In re Denture Cream Products Liability*

*Litigation*, No. 09-2051-MD-ALTONAGA, 2011 U.S. Dist. LEXIS 65550, at *26 (S.D. Fla.

June 13, 2011).  Defendants offer no persuasive authority—and at times, no authority at all—as

to why the Court should suddenly forsake its "gatekeeper" role in this case and allow Defendants

to parade in front of a jury a multitude of speculative hypotheses of fire cause and origin.

Rather, they simply proclaim that their experts "are far more reliable than those of Barnext's

---

[50] *See* [ECF No. 279 at 8–11].
[51] [*Id.*].
[52] [ECF No. 303 at 15 (second emphasis supplied)].

15

experts," Thomas Long and James Edmonds, and that Defendants' experts are allowed to point out the flaws in the opinions of Barnext's experts.[53]   But just because Defendants wish to use Coté and Henderson as *de facto* rebuttal experts does not give them license to ignore *Daubert*. Moreover, Defendants' attack on Long and Edmonds—which Defendants did ***not*** move to exclude—only serves to highlight their lack of a proper response in support of their own experts.

### *i.   Qualifications*

Defendants offer no serious response to Barnext's challenge of Coté's qualifications as a fire cause and origin expert.   First, Defendants' contention that a "marine electrician" has "***implicit***" knowledge on the "prevention and containment of electrical fires on boats"[54] is devoid of any factual or legal support.   It is Defendants' burden to provide such support, *United Food Mart, Inc. v. Motiva Enterprises, LLC*, 404 F. Supp.2d 1344, 1346 (S.D. Fla. 2005), and their failure to do is fatal.

Second, Defendants' contention that Coté, as an engineer, is rendering a "*de facto* cause and origin opinion" since a defective capacitor was the cause of the fire in this case[55] is entirely nonsensical.   Simply because a defective capacitor was the cause of the fire on the Yacht does ***not*** mean that every opinion given by Coté on fire cause and origin is an engineering opinion. Moreover, Defendants plainly ignore that Coté ***never*** rendered an opinion based on any ***engineering*** knowledge, but rather, impermissibly engaged in broader fire cause and origin analysis.[56]   *See Am. Family Ins. Group v. JVC Ams. Corp.*, No. 00-27(DSD/JMM), 2001 U.S. Dist. LEXIS 8001, at *6 (D. Minn. April 30, 2001) (explaining that while electrical engineers

---

[53] [ECF No. 303 at 14].
[54] [ECF No. 303 at 15 (emphasis added)].
[55] [ECF No. 303 at 16].
[56] *See* [ECF No. 280 at 8–9].

may be qualified to render opinions regarding cause and origin of electrical fires, this does not necessarily qualify engineers to "render *broader* opinions about fire scene analysis and fire origin.") (emphasis added).  As such, all of Coté's opinions are unqualified.

Third, to say that Coté has mere "deficiencies" in his education and experience in the fire sciences is an understatement.  Coté's education and experience in the fire sciences is not just lacking, but virtually nonexistent—which he effectively *admits*—or is otherwise not established by Defendants.[57]   As such, Coté's lack of education and experience is not a "fertile area for cross-examination," but sufficient grounds to disqualify him from testifying in the first place.

###        ii.        *Reliability*

Defendants' attempt to rehabilitate the "burn tests" only serves to confirm Barnext's conclusion that the "burn tests" are "patently absurd."  Defendants' only argument for admitting these tests is that they were "qualitative"—without explaining the significance of that label—and used for "one simple purpose, which was to *confirm the known data* about these electrical components, *i.e.*, that they are not flammable."[58]  And tied to this argument, Defendants contend that Barnext's fire cause and origin expert, Long, is "*shockingly* wrong" in maintaining that the UL 94 is a proper standard for assessing the flammability of certain materials.[59]

Defendants, however, fail to realize that the "data" their experts are trying to confirm with the "burn tests" *are* the UL 94 flammability standards.[60]  Thus, it seems that Defendants'

---

[57] *See* [ECF No. 280 at 9–11]
[58] [ECF No. 303 at 16, 17 (emphasis added)].
[59] [ECF No. 303 at 17].
[60] Coté references quality tests conducted by the "*Instituto Italiano del Marchio di Qualita*," or ("IMQ")  [ECF No. 280–1 at 12], and the English translation of the emails transmitting those tests indicates that the UL 94 flame rating was applied.  A copy of the IMQ documents is attached here as Exhibit "5".  Moreover, Henderson specifically references UL 94 ratings in his expert report.  *See* [ECF No. 280–5 at 8–10].

experts, in order to confirm flammability standards **already available** and created through the use

of a small, fixed flame,[61] decided to **blast** the component parts of the Condaria Control Panel

with blowtorches.  Little else needs to be said to show just how un-scientific the "burn tests" are.

Moreover, through their attempt to breathe life into the patently absurd "burn tests,"

Defendants have effectively **admitted** that Coté and Henderson's opinions have no scientific

basis whatsoever.  Specifically, if the "burn tests" are indeed meant to just confirm standard UL

94 ratings, then considering that Coté and Henderson rely almost exclusively on the "burn tests"

for their opinions, then Coté and Henderson's opinions are based on nothing more than a cursory

glance at the UL 94.  Indeed, nowhere in their opposition do Defendants explain what **else** these

experts did to arrive at their "conclusions," apart from ever present conclusory statements

unsupported by the record.[62]  In sum, the expert reports and opinions of Coté and Henderson

should be struck in their entirety.[63]

       b.      *Neil Maclaren.*

In a two-paragraph response, absent any case law or virtually any record citations,

Defendants maintain that Neil Maclaren, their repair expert, "did everything that a marine

surveyor normally does."[64]  But following that conclusory statement there is absolutely **no**

**explanation** as to what, in fact, marine surveyors "normally do."  Rather, Defendants merely

---

[61] *See* [ECF No. 280 at 15 (explaining UL 94 testing methods)].

[62] Nor do Defendants provide any meaningful response regarding the scope of Coté and Henderson's testimony, opting instead to give disparate conclusory statements with no supporting authority, legal or factual.  *See* [ECF No. 303 at 21].

[63] As a final consideration, and to once again correct the record, it should be noted that Barnext never faulted Henderson for reciting incorrectly the elements of the scientific method "off the top of his head" during deposition.  [ECF No. 303 at 20].  Rather, Henderson misstated the steps of the scientific method **within his expert report**, missing the last two crucial elements of testing and arriving at a conclusion.  [ECF No. 280 at 33 (citing Henderson Report ¶ 28)].  Presumably, Henderson did not write his report off the top of his head.

[64] [ECF No. 303 at 22].

redress in loftier terms the circumstances surrounding the $350,000 initial "**guess**" of cost of repair agreed upon by Maclaren and Sparrow,[65] and then quote Maclaren as stating that cost of repairs are customarily what marine surveyors do during casualty surveys.[66]   In other words, Defendants argue that Maclaren's "guess" as to cost of repair is reliable because (1) he is a marine surveyor, and (2) marine surveyors often give such guesses in casualty surveys.   Clearly, this is not a sufficient showing for admitting Maclaren's expert opinion.

Moreover, Defendants forget that the initial repair cost consensus between Maclaren and Sparrow is **not** Maclaren's actual opinion as to cost of repair.   Rather, Maclaren gave two contradictory opinions: (1) that a final cost of repair could not be definitively given, and yet (2) that **$600,000** was a reasonable final cost amount in this case.[67]   Defendants offer **no response** to Plaintiff's argument that Maclaren's first opinion is entirely unhelpful to a jury, or to the incontrovertible realization that the $600,000 figure has no basis in fact apart from mirroring the exact number Condaria agreed to pay Pershing for the repair costs.[68]   As such, Defendants' effectively concede the unreliability of Maclaren's expert opinion.

      *c.*    *Roy Sea.*

It is apparent from Defendants' response in regards to their valuation expert, Roy Sea, that Defendants believe it permissible for an expert to render a valuation opinion based on his "feel for what's happening with prices."[69]   Indeed, where Barnext sees an unqualified,

---

[65] *See* [ECF No. 280 at 47–48].
[66] [ECF No 303 at 23].
[67] [ECF No. 280 at 47–49].
[68] [ECF No. 280 at 48].
[69] [ECF No. 303 at 23].  Moreover, Defendants would have the Court believe that **every** sale made at "arm's length" is by definition a sale made for fair market value, even though the logically implication of that argument is that an identical product sold at different prices can have **multiple** fair market values.

10093864.1

unscientific, and patently silly repair opinion based on the apparent olfactory prowess of Sea's nephew,[70] Defendants see an "important qualitative test" with "an extra set of the most accurate device known to determine whether the yacht has a smoke odor—the human nose."[71] Defendants' response merely re-casts Sea's opinion in loftier legal terms; but no amount of window dressing can hide the unreliability of Sea's valuation opinions.  As such, Sea's expert report and testimony should be struck.

> d.    *Thomas Danti.*

Defendants likewise offer no true opposition to Barnext's challenge of Danti's opinion, opting instead to classify that challenge as a Rule 403 dispute.  That is not the case; Danti's opinions are objectionable because they are irrelevant, concern matters beyond his expertise, are highly speculative, and are improper legal conclusions.[72]  Offering no answer to those challenges, Defendants effectively concede the unreliability of Danti's expert report and opinion.  Moreover, the "undertaker's doctrine" is clearly inapplicable against Dr. Jerald Kramer, who—by Defendants' admission[73]—merely checked on the fire and did not actually purport to put out the flames.[74]  As explained in *L.A. Fitness Int'l, LLC v. Mayer*, 980 So. 2d 550, 560–61 (Fla. 4th DCA 2008), the undertaker's doctrine will not subject a party to liability where the party takes an **initial step** to assess whether or not to render help.  *Id.* at 560–61 (gym employee's initial assessment of decedent did not commit employee to render CPR under the undertaker's

---

[70] *See* [ECF No. 280 at 55].
[71] [ECF No. 303 at 25].  Ironically, Defendants moved in *limine* to prevent Mr. Barnett from testifying as to how his **own boat** smells after repairs.  *See* [ECF No. 281 at 7].
[72] *See* [ECF No. 280 at 56–60].
[73] [ECF No. 303 at 26].
[74] *See* (Alexander 105:18–111:14); (Kramer Dep. 6:20–8:25).

20

doctrine).  Having only taking a preliminary step in the prevention of the Yacht fire, Dr. Kramer would have no liability in negligence to Barnext.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on April 18, 2012, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on Walter G. Latimer, Esq., and Russell M. Pfeifer, Esq., WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKLER LLP, 3800 Bank of America Tower, 100 SE Second Street, Miami, FL 33131 in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**ARNSTEIN & LEHR, LLP**
Attorneys for Plaintiff
200 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, Florida 33301
Telephone:     954-713-7600
Facsimile:     954-713-7700
Email:          agkipnis@arnstein.com
                    jrdelgado@arnstein.com


By:    /s/ Jorge R. Delgado
          Alan G. Kipnis
          Florida Bar No. 181788
          Jorge R. Delgado
          Florida Bar No. 084118

10093864.1